And if counsel would like to come forward and just let us know how much time you would like to reserve for rebuttal. I would like to reserve two minutes.  I'm James Tree, or some people call me James Namu. I'm pleased today to be able to represent Ms. Brambila in this disability claim. Understanding her history is essential to understanding her impairments and understanding why there was a consensus, the 12 different medical opinions that were given, all saying that she could not sustain full-time work. Why were those so consistent? Why does she have these disorders, migraine headaches, pseudo-seizure disorder, many mental impairments? Since the time is short, would you mind if we went to questions? Would that be all right? Okay. So on the migraines, I see your point that the ALJ only relied on one incident. He said, for example, and listed the one from, I guess it was Dr. Lee. But we look at the ALJ's reasons and we look at what's in the full record. And there are other pieces of evidence that support that. And I just wanted to go through, you know, in the 2020 hearing when she was asked, how often do you have a migraine? If you take your medicine, though, do you still have it? She says, no, if I take my medicine on the clock, I will not have a migraine, maybe one a month, maybe if I'm under terrible stress. But if I take my medicine, as indicated, I will be okay. And then you have Dr. Kazansky, August 10, 2020. Currently, she has about one migraine episode a month. And then when she went, she was represented by counsel. She went to the physician assistant, Lauren Holman, to specifically fill out her disability form on both May 18, 2021, and June 23, 2022. She does not mention migraine at all. And this was specifically for the purpose of filling out her disability forms. So I guess my, you know, we look at the ALJ's reasons. The ALJ said what I think is inconsistent in the testimony is the frequency of the migraines and headaches. And I think the treating records don't document the frequency that she describes. So how are we to consider that there are significant other pieces of the record that would support that finding? Yeah. Well, our argument is regarding migraines is we're not so much contesting what the ALJ said about it. What the ALJ's finding was that she had, at different times in the record, she had frequent headaches, migraines, but they reduced to two a month, one to two a month at their best. And that was the ALJ's finding. And what our point is, is even that is disabling because the vocational experts said that if a person misses, can only miss from zero to one day of work per month. So if they miss more than one day per month, they're not going to be employable. But what do we do with she went to the physician assistant to fill out her disability form, doesn't mention any migraines, any headaches at all. This is 1107 and 1141 of the record. Why couldn't the ALJ have relied on that to say, I find the treating records don't document the frequency of headaches that she describes? In Social Security disability cases, it's improper for the court to superimpose what the ALJ could have said. We can only adopt what they did say, and if they did not say the proper things, that's legal error. And so what the ALJ said is that she has headaches at best, the lowest amount is one to two per month. Well, I'm going to quote it. It says treating records also do not document migraines or headaches of the frequency she has described. Then she says recently, for example, and then the statement that you're saying. That's not I guess migraines are important part of it, because with the ALJ's findings, she's disabled from one to two migraines a month. But the most important thing, I think, to understand about this case is that this lady, she came from a dysfunctional home. Her mother was alcoholic, who often left her alone when she was a young child. Well, let me follow up what Judge Koh is asking you. In the record, her headaches began in 2007 following a car accident. There's a July 18, 2017 progress note by the physician's assistant, Lauren Holman, indicating that these migraines were not very frequent. But from then onward, she began to report more frequent migraines. And by November 2017, for example, she reported experiencing 15 migraines per month. Is there anything in the record that explains why the frequency of her migraines increased so drastically in 2017? I believe so, Your Honor. First of all, migraines and pseudo-seizure disorder, three of the primary reasons to have these, or three substantial reasons, is a reaction to stress, a reaction to past traumatic events, and a reaction to pain. Is that in the record? That is, much of that is in the record, yes. All right. What are we to make of this pseudo-seizure disorder? How often is this happening and how debilitating is it? So the pseudo-seizure disorder, she went to Harborview Medical Center Seizure Clinic. This is another error the LJ made. She said she had no inpatient, but she had an inpatient to study her seizures to see if they were epileptic or pseudo-seizures. They found her seizures were real. They witnessed them while she was in the hospital on inpatient stay. They videotaped them. They said they were real. They were pseudo-seizures. She has them at variable amounts of time. A lot of it, they're brought on by stress and past traumatic events that she's had in her life, which are very, very significant, Your Honor. So they're very variable. We believe the ALJ's error was not in finding that they were severe, which she did find they were severe, but was in not discussing the frequency and how they affected her. For example, they noted when she saw Dr. Lee, the neurologist, she had a pseudo-seizure in front of him. Her longtime principal care provider is physician's assistant, Holman, who's treated her for over 13 years, and he witnessed them. She couldn't speak during those times she had them. She had communication disorder, and the ALJ says there's no indication of any communication problem in this record. That's clear error. They were all noted that they had them, and she had significant problems with them. They vary from one to two a month to she was having them multiple times per day, and it varies based on her stress and her reaction to it. That's why it's important for her not to be pushed out because one of her coping mechanisms is to retreat. That was one of the big errors that the ALJ made, I think. Can I ask you, why didn't she testify about the pseudo-seizures during the 2023 ALJ hearing? She did testify about it at the 2020 hearing, and she was represented by counsel in 2023. Yeah. Why was that? They were well-documented by that time in the record, very well-documented. Okay, so you're not arguing that the ALJ erred in discounting her testimony to frequency or severity because she didn't testify to it with regard to the ARF? Yeah, go ahead. I'm sorry. I apologize. The error was in the ALJ found them to be severe, but the ALJ gave nothing in the RFC indicating how they affected her. Absenteeism from work, 12 opinions that she would be absent from work, 12 out of 12. Nobody gave contrary opinions except DDS who only reviewed 24% of the record. They didn't have the record because they reviewed it back in 2018 and early 2019. Can I ask you to explain more specifically how you think the ALJ failed to account for her obesity? Yes. So the Social Security ruling on obesity says that obesity will compound problems like lumbar problems where you might have a lumbar problem. Like in her case, she has mild degenerative disc disease. That would normally say, okay, a person is not going to have a substantial problem with that. But when you compound that on top of a person with a BMI of the 50s to 60s where BMI of 30 is obese, BMI of 40 is morbidly obese, and she's 50 to 60, what the Social Security agency policy is, is that ALJs need to understand that although the x-rays show mild disorders, that will compound it to a very severe level. And that's what she failed to appreciate or articulate in her decision. Has Ms. Bramble ever held a job that would qualify a substantial gainful activity? Never. That was one of the ALJ's errors was that she said that she was discounting her complaints of migraines because she said she had had them for 10 years. And during that 10-year period, she had worked. But when you look at the certified earnings record from Social Security, you'll see eight of those 10 years, she didn't work at all. She had zero earnings. One year, she had $1,000 of earnings for the whole year. Another year, $3,000 for the whole year. But the ALJ said that's why she discredited her. And there was three or four places in the decision where the ALJ said her past work discredits her. What do you do with the fact that she's apparently able to care for five children plus, I guess at times, a nephew? Five kids is a lot of kids to take care of. That is. Social Security is a non-adversarial right proceeding. It's an inquisitorial according to the Supreme Court. The ALJ is more than an umpire. They need to evaluate evidence for and against. This was a critical error that the ALJ made that requires reversible error because we don't get to substantial evidence until, first, the ALJ evaluates both evidence for and against a proposition. The ALJ over and over again only evaluated evidence to prove that she wasn't disabled but didn't speak of evidence that she was. This is a perfect example, Your Honor, when we're talking about the activities of daily living and taking the children because she didn't mention that she falls asleep when she's watching small children. She didn't mention that she gets help from her mother, from her sister, and from her neighbor and from her older kids that were teenagers. She didn't mention that twice a month, on average, the kids miss the school bus and she's not able to take them to school because she's not feeling up to it. So the kids miss school, on average, twice per month. The ALJ was silent on that. So we don't get to substantial evidence because she committed reversible legal error by not articulating those reasons. Then, if she had articulated those and gave reasons why she was accepting one over the other, then we get to substantial evidence. But the law is clear by this court that if an ALJ fails to address a source of statements that would compel disability, the ALJ harmfully errors. That happened with a physician's assistance. Holman, 13-year primary care physician. Can I ask you a question about the pseudo seizures? It seems like there's a different error because the ALJ says there's no specific listing for pseudo seizures, so I'm going to use the epilepsy listing. But then the epilepsy listing specifically says we evaluate psychogenic seizures and pseudo seizures under the mental disorders listing that's 12 and not 11, which is for epilepsy. It says that, again, we do not count pseudo seizures under 1102, which is the epilepsy one. It says we evaluate these seizures under mental disorders, which is listing 12. If you go to listing 12, there are four criteria that she would have to meet. The understanding, remember, apply information, interact with others, concentrate, persist, or maintain pace, adapt, or manage oneself. In order to qualify under paragraph B criteria, which is these four, you have to have either one extreme limitation or two market limitations, and the ALJ found all of those were moderate. You're not appealing that because it's the same paragraph B criteria for her other disorders, anxiety, depression, personality disorder, trauma, 1206, 1204, 1208, 1215, all have the same criteria as somatic symptoms. I suspect that's why the government didn't defend because the ALJ committed that error using the wrong listing. But if we look at the right listing, then we're not in the category of you get once a month generalized tonic-clonic seizures for at least three consecutive months, which is the only criteria for if it were an epileptic one. And instead, you fall into this category, and then you agree, you didn't appeal this, she's not going to qualify for criteria B if we use the right listing for pseudo seizures. It's really more mental health disorder and not epileptic physical disorder. Yeah, we agreed that if you could use the epileptic listing, she would meet the listing. She would meet that listing because of the frequency. But you can't. You're right. She has to use the mental listings. Why didn't you raise that in your brief? You kind of forfeited this issue because you didn't raise it that they used the wrong listing. You just kept saying we qualify under the epilepsy listing. What our point is, is it's not so much the listing, it's the residual functional capacity. There the ALJ, and we made this argument, there the ALJ said there's no communication problems in the file. Clearly, there's communication problems while she's having these series that she can't talk.  It has been witnessed by her neurologist, by Harborview Medical Center, by her 13-year treating physician. They've seen them. They've documented it in the record. She does have communication problems. Okay, but I understand your argument. But I just want to – you do agree that the epilepsy listing is the wrong criteria for a pseudo seizure. Right. And she didn't properly evaluate the RFC. So then why are you continuing to argue the epileptic criteria if you agree that that's the wrong one to use for a pseudo seizure? Yeah. Because in your brief, you keep saying she meets the epileptic criteria. She's had one for three consecutive months. Yeah. If that's a legal – yeah, go ahead. Not that she meets the listing so much is that by analogy, what's the purpose behind the listing? It's that a person is presumed disabled if they have this level of impairment. And so it's not so much meeting it as it is equaling it. So she has the same type of manifestations and the same type of limitations. So it equals what they're talking about in the epileptic listings. Hey, if you have one a month, it's so disruptive, we're going to presume you're disabled. You don't have to prove that you can't – you can go back to your other work or you can do your past work or other work. You're automatically disabled. Well, let me ask you this. The ALJ noted that her mental health issues were primarily triggered by situational stressors and did not require inpatient hospitalizations, and that she remained generally independent in her daily activities despite those mental health issues. Is it reasonable to read into the decision as saying that Ms. Brambilla's pseudo seizures, which were psychogenic in nature, were not as limiting as alleged for substantially these same reasons? No, I don't think so. I don't agree. I wouldn't agree with that, no. I think that the ALJ's findings were that she did have severe psychogenic seizures. Then the ALJ was silent on the effect of those, the frequency of those, and that was clear legal error because they are of such a frequency. We can see by analogy they're of more frequency than the epileptic seizures, although the epileptic listings don't apply. By analogy, they do apply because they show that a person who has them of that frequency doesn't have the ability to sustain full-time work. Every treating and examining person that looked at this record opined that she cannot do full-time work. That's consistent. That's supportable. The only two that didn't were the DDS guys that saw this case early on back in 2018 and early 2019. By the time we get to the second ALJ hearing, it's 2023, and there's over 600 additional pages of medical records. They only reviewed less than 24% of them. This decision is not supported by the many errors that the ALJ committed. The bigger trigger to me is that the ALJ failed to discuss the evidence that supports disability. Yeah, she cherry-picked evidence out of the record that supports non-disability, but she failed to discuss the evidence that supports. At page 25 of our brief, we list 70 specific examples of mental health impairments that were not benign. Yet the ALJ said her mental health situation shows it's benign, and then she goes through and scours the record to find every time when there's something normal and puts it in there, but fails to list any of the 70 that were non-benign. And those are specifically listed in our brief, and they're significant. They're paranoia. There's all sorts of them. There's a lot of things that are very significant. Excuse me. You're over nine minutes over your time. Let me see if my colleagues have any questions. I'll give you two minutes for rebuttal. Let me see if – okay, thank you, but you'll have two minutes for rebuttal. Thank you. Good morning. May it please the Court, Jeff Staples here for the Commissioner, who asks that you affirm the district court's judgment because substantial evidence supports the ALJ's fact-finding. Mr. Staples, let me ask you. Please do, Your Honor. If Ms. Brambilla was absent from work more than one day per month or off-task more than 10% of a workday, then would you agree she can't sustain substantial gainful activity? Yes, Your Honor. All right, thank you. Here, however, Ms. Brambilla didn't have that amount of limitation, and the ALJ reasonably looked through the record as a whole and decided that while that was consistent with her allegations, it wasn't fully consistent with the medical record. But she alleged that her migraines caused memory problems. That's correct. The ALJ noted that no memory problems associated with her migraines are documented in the medical record. I understand why the absence of such documentation would justify discounting her allegations about memory problems, but why would it justify discounting other allegations about the severity and frequency of her migraines, specifically that they occurred once or twice a month and lasted at least two days? Yeah, so the memory issues was one thing that she complained about related to the migraines, and the ALJ went through and documented why that was not consistent with the record. But that was not the only thing that the ALJ hung the proverbial hat on. There was a lot of other issues with inconsistencies as far as her statements about the headaches. She did come and claim in front of the ALJ in 2023 that she was having these two headaches a month lasting at least two days. But did the ALJ say that's why she's discounting the severity and frequency of the migraines? Yes. The ALJ said that her testimony about the frequency and severity was not consistent with other evidence in the record, including, for example, evidence showing that she was having only one to two mild headaches a month of short duration, and that's at 1030 and 1196. Moreover, as Judge Koh was pointing out at the first administrative hearing, she said her headaches are essentially under control on topamax, so that if she takes it regularly as it's prescribed, she's not having any headaches, and that's at 49 to 50 of the administrative record. Then at 1141, she's talking to her primary care provider and to fill out disability paperwork doesn't make any mention of the headaches. So, you know, the inconsistency between what she said about her memory problems and the normal memory findings, that was one thing. Then there was the other inconsistency between what she said about the frequency and duration with the other evidence in the record showing that her headaches were under much better control on medication than she let on at the administrative hearing. Well, the ALJ found that the treating records do not document migraines as frequently as Bramble alleges. Yes. But for support, the ALJ cites only two pages from the entire record. Those pages are notes from Ms. Bramble as treating neurologist on June 9, 2020 and on January 23, 2023. And it's the same note in each document, namely under the history of illness section, the notes state that Ms. Bramble began taking medication in August 2018 that helped reduce her headaches to one or two per month of short duration. This looks like a bit of cherry picking, doesn't it, on the record? Why does the cursory notation in pages two of the record amount to substantial evidence to discount her allegations? Concerning her migraines, especially when there are plenty of other records reflecting that from 2019 onward, Ms. Bramble complained of more frequent and severe headaches. Yeah, that's a fair question. I think, you know, if there were only this one citation in the entire record and everything else went the other way, we'd be having a different discussion. I think the ALJ was using that. I believe the ALJ used the phrase, for example. So I don't think the ALJ thinks that this is the only time in the record that this occurs. You know, there are other instances in which she complains of longer duration and more frequent headaches. But there are also places where she admits that her headaches are under much better control than what she said at the administrative hearing. So the use of that one example, I don't think that deprives the court of the ability to go through the record as a whole, as the ALJ did, and find those examples where the medical record just doesn't quite line up with what she's saying about the frequency and duration of her headaches. Have you done that? Yes, Your Honor, and I went through a few other examples here. You know, at the first administrative hearing, she said she has no headaches as long as she takes her Topamax. And then, you know, as Judge Koh was pointing out, she's filling out disability paperwork with her primary care provider and doesn't mention the headaches at all. I think that's a fair basis to conclude that she's, you know, maybe not admitting the full improvement that she experiences on the medication that she's taking for her headaches. Let's talk about her pseudo-seizure disorder. It looks like all the ALJ did was describe the disorder as non-epileptic, which no one disputes. It doesn't look like the ALJ gave any specific reasons for discounting her allegations concerning the severity and frequency of her non-epileptic seizures like episodes. Describing her diagnosis is not a reason for discounting her reports about the limiting effects of that diagnosis. I don't see anywhere in your answering brief that directly addressed the ALJ's treatment of Ms. Brambila's pseudo-seizure disorder. Do you want to address that now? Yes, Your Honor. Thank you very much for the opportunity to do so. So the ALJ at Step 2 found that the psycho-seizures, or pseudo-seizures, pardon me, were a severe impairment, talked about them at Step 3 using the epilepsy listing, and then in the RFC section had a few paragraphs explaining what these are, how they've been looked at by different treatment providers. And the conclusion of this is that her treatment of these is characterized as a mental impairment. So it's not a physical epileptic-like disorder that would be amenable to seizure medication, etc. This is something that her treatment providers think is best addressed in the context of a mental impairment. So why do we care? I mean, call it one thing, call it another. Describe the phenomenon without respect to the label. It's still the same phenomenon. Yes. But once it's characterized as a mental impairment, the ALJ has gone through and explained why the mental limitations that she's identified are not consistent with the record. So, you know, placing it in that context. I'm not sure I understand. That is to say, you're saying the ALJ says what you're talking about, the frequency of these episodes, is simply not true? And is that because of the label? I mean, I don't understand why the label makes a difference. The ALJ either is supported or not supported in finding that her allegations or statements about these, what they call pseudo seizures, is true. So the ALJ went through and explained why her statements about her mental impairments were not consistent with other evidence in the record. Yeah, but calling it a mental impairment as distinct from something else doesn't make it true or not true. That just changes the label. Right. But when you label it as a mental impairment, now the ALJ's analysis of her mental impairments explains what the ALJ is thinking about the pseudo seizures. Did he say, and I didn't see anywhere where he said, the reason he's not given any specific reasons for discounting her allegations concerning the severity and frequency of her non-analeptic seizure-like episodes is because it's a mental impairment. I didn't see him say that anywhere. No, I'm sorry, Your Honor. What I mean is that by when the ALJ characterizes the pseudo seizures as a mental impairment, now you have to look at the ALJ's analysis of the reliability of her statements about her mental impairments. And the ALJ went through and explained several reasons why those were not fully reliable. So you kind of fold the pseudo seizures in with that and see that, you know, they're really based around her stress and her anxiety, her alleged stress and anxiety. That's where she says these are arising from. But, you know, you look at something like her allegation that her anxiety won't let her leave the house, and then you've got her daily activities that include things like, she says she goes to the park a lot with her kids. She's participating in her kids' schooling. She's caring for quite a lot of kids. Well, let me ask you, in Brown-Hunter v. Colvin, we explain that when discounting claimant testimony, an ALJ must identify the specific testimony she finds not credible and link that testimony to the particular parts of the record supporting her non-credibility determination. In this case, when addressing Ms. Bramble's daily activities, the ALJ described those activities and then concluded that her ability to perform them suggests she's not as incapacitated as she described. But I don't see anywhere where the ALJ specified what aspects of her testimony were undetermined, excuse me, were undermined by which activities. For example, the ALJ didn't say Ms. Bramble's ability to grocery shop indicates that she can have more public interaction than she has alleged or that her ability to help her children with homework indicates that she can concentrate better than she alleges. Do you think the ALJ's discussion of Ms. Bramble's daily activities adequately explains which of Ms. Bramble's allegations she thought were undermined and why? I see I'm out of time. Let me just take a few minutes to answer this question, though. Yes, I do think that the ALJ went through and explained which of Bramble's allegations the ALJ was discounting. So the ALJ at the front end of the analysis goes through and summarizes Ms. Bramble's allegations about her limitations. Does she specify what aspects of her testimony were undermined by which activities? The ALJ did not go on a one-to-one basis of, you know, here's an allegation and here's an activity that undermines it. The ALJ has at separate points in the decision a summary of the allegations, right, that's at the front end, and then a summary of the activities that's at the back end. Without matching them up. Doesn't do that exact linkage on a per limitation basis. I don't think, you know, you quoted Brown-Hunter and that's well taken. I'm not sure that in my view that that's what was, that's what the court was getting at in that case, that you have to go through every single limitation if you're going to use a claimant's activities against them, that you'd have to go on a one-to-one basis. I think, you know, can you take these allegations and can you hold them up against these activities and can you see any fairly characterized conflicts there? And I think you can in this case. You know, this is a person who is saying she essentially can't leave the house. She's getting days-long headaches at the, you know, the first hint of stress. But then on the other hand, you've got she's caring for many children, including several that are not her own. She's participating in their schooling. You know, I just think that it's fair to say that those two things don't really line up very neatly. But it doesn't sound like she's doing a very good job caring for these kids as we just heard. I mean, she needs a lot of help. The kids miss school. I mean, we're not talking about a competent caretaker. Well, and, you know, to be fair, the ALJ didn't paint this as a one-sided record. Right, but I'm wanting to qualify what you're saying when you're making it sound as though, hey, she's got all these kids, she's doing a great job. No, she's got all these kids and she's not doing a great job. So, yeah, the ALJ didn't find that she can just do the full range of all work. The ALJ found she had a really limited, especially mental, ability to work. So she's doing simple one- to three-step tasks. The ALJ agreed that, you know, she does have some problems, that she's not excelling in all these aspects of her life. Well, let me ask you this. Assume we find the ALJ erred in discounting her allegations concerning the severity and frequency of her migraines and her non-epileptic seizure-like episodes. If we credit those allegations, it appears Ms. Brambola would be incapable of sustaining substantial gainful activity because of absenteeism or being off-task too much. In that situation, why shouldn't we remand for an immediate award of benefits? So, for one thing, well, let's start with the headaches. You would have to pick which allegations to credit because on the one hand, at the 2023 hearing, she says she's having two headaches a month, two to four days, or two to four headaches a month, two days long each. At the earlier hearing, she says that she's having no headaches so long as she takes her medication on time. So I think that that would be a conflict in the record that would need to be resolved on remand. As for the pseudo seizures... Let me back up. You're saying when she testifies the last time, you're saying what her current condition was at that time, the ALJ could have credited the earlier testimony where she talked about what was happening in 2020? So in 2023, she was asked about the whole period. She was asked about 2018 on, and she said it was two to four a month, two days long. But back in 2020, she said it was under control. So I think that's a conflict that would need resolution on remand, were the court to find a harmful error in this analysis. Likewise, for the pseudo seizures, I didn't really see any allegations specific to that in the most recent hearing. You know, I think it was mentioned at one point, but she never said, here are my functional limitations. Moreover, the people that have observed it have seen, you know, one to a couple of minutes of difficulty having a conversation. She says this happens one to two times a month. I don't think that by itself demands a finding of disability either. I think you would need to flesh out, you know, to what extent are these actually causing any problems? You know, beyond that, you know, maybe a couple of minutes a month communication difficulties. So I don't see that as a basis for a finding of disability either. I'm happy to answer any further questions. Yeah, I didn't get a chance to ask any questions so far, and I do have some for you. Feel free, Your Honor. Okay, so why is it not reversible legal error that the ALJ considered the wrong listing for the pseudo seizures? And specifically said there's no listing for pseudo seizures, so I'm going to use the epilepsy ones. You agree that was reversible legal error, wasn't it? I do not agree, Your Honor. So the ALJ considered the pseudo seizures under the epilepsy listing. Then he also considered all of her mental impairments under the listings, you know, 1204, 1206, 1208, 1215. So no matter where the seizures fall, they're not disabling at step three. And the ALJ made all the findings required. I would agree with that because those weren't challenged, the moderate limitations on the paragraph B criteria. But is your argument then a harmless error one? Because I do think it was error for him to not use the right listing or she. Pardon me, she. So I think. Is it a harmless error argument you're making or what kind of argument are you making? My primary argument would be no error because the ALJ considered all the, any listing that could possibly apply, the ALJ considered it. To the extent that the ALJ erred by not mentioning pseudo seizures as part of the 1204, 1206, et cetera, that's a harmless error because there's no evidence that they would contribute to additional limitations in the B criteria. So it's at most a harmless error. And I think since the ALJ considered all the listings and that consideration is supported by substantial evidence, I think you could also fairly say it's no error, but at most harmless. Okay. So let's look at the two paragraphs on 731 that address pseudo seizures. Do you want me to get my computer so I can follow along with you? That's a question for you. I'm not going to tell you what to do on this. Go ahead, Your Honor. So the argument is this just talks about a diagnosis. It doesn't explain how it affects Ms. Brambilla's ability to work. So tell me where in there there's anything that explains how the pseudo seizures affect her ability to work. So I think, first of all, I think that's tough because she's not really talking about how they affect her ability to work at the administrative hearing. So she's not coming in presenting, you know, here's the ways in which my seizures limit my ability to work. And isn't that the ALJ's responsibility to put that in her opinion and say this is how I think this impacts residual functional capacity because there was no testimony as to that. But I don't see that here. So I think, well, when you're talking about, you know, is the ALJ going to discount her statements, you know, you have to know what the statements are. You know, in what way does she even say that they limit her ability to work? You know, it doesn't really appear that she's bringing forth much evidence that these are causing, you know, work-related problems. To the extent that they do, though, the ALJ, you know, goes through that treatment history, you know, she's having the EEGs, et cetera, and they're finding they're not a physical impairment, they're a mental impairment. So I think what the ALJ is doing is folding those pseudo seizures into the analysis of the mental impairments. And when the ALJ is giving reasons to discount her statements about her mental impairments, I think that serves very well to discount any allegations she may have made about the limiting effects of the pseudo seizures. So, you know, for example, she's saying she has this, you know, debilitating anxiety, high stress response, but the record kind of shows that maybe that wasn't as severe as she was claiming. I think that's what covers the analysis of the pseudo seizures as far as the, you know, reasons to discount her allegations. So that's kind of how I read the ALJ's decision. What are we to make of the fact that she didn't testify in 2023 to pseudo seizures? I make of it that they didn't cause her significant functional limitations. You know, she's represented by an attorney. This is the time to bring forth anything that you think is causing you problems. At the first hearing, she wasn't represented, and that's, you know, we could give more latitude maybe in that instance. But when you're there with an attorney, I think most people tell the ALJ everything that's wrong with them. You know, and that interpretation is consistent with, you know, Dr. Ginth did an examination. He saw her have one of these, and it's just she stutters for about a minute. She, you know, has difficulty communicating for that minute, and then she says these happen a couple of times a month. So I don't really think, you know, that to me doesn't sound pleasant, certainly, but it's, you know, I think it's difficult to you can take that together with her failure to discuss it and see maybe, you know, this isn't causing the most limitations. But there's evidence in the record that they're much more frequent at times. Yes, yes. There is some evidence, you know, maybe suggesting that she's having more of them at times, but to the extent that they're, you know, kind of linked with her. There are records at several points that she's getting multiple episodes per week. Yes, and I think, you know, she, there is evidence that a reasonable fact finder could take this and go a different direction. Are you saying that a reasonable fact finder can disbelieve her on this point? Yes. Is that what you're saying? I am. She's just not telling the truth about this. Well, I mean, call it what you will. I don't think her allegations fully line up with all the evidence in the record. You know, it's, I don't think that's the ALJ saying she's lying. But to some extent, her allegations are not lining up with other evidence in the record, you know, including her, you know, extensive child care activities, including other evidence showing that her conditions are under much better control than she's come into the hearing and alleging. So I think the ALJ is entitled to rely on that as more than a mere scintilla of evidence supporting the ALJ's findings. And because substantial evidence supports the ALJ's findings, the court should affirm. Okay. You've gone over your time. So let me just see if any of my colleagues have any more questions. I just have one question. You're saying the ALJ said they didn't line up, but didn't identify the specific testimony she finds not credible. And didn't link that testimony to the particular parts of the record supporting her non-credibility determination. Drew? I think on many points, the ALJ did specifically line up allegations with the medical record. You know, for instance, we've talked about the alleged memory problems. And the ALJ went through and said she alleges these memory problems, but the medical record shows she actually has no memory problems. So, you know, on the frequency of the headaches, she comes into this hearing and says she's having two to four a month lasting two days. But the medical record shows. Well, let's specifically talk about the allegations concerning migraines and pseudo seizures. The ALJ didn't line those up, did she? Did line up on the headaches, the migraines, yes. You know, lined up, you know, on the one hand you have her saying they occur with this frequency and this duration and then here's medical records showing they are a much less frequent and of much shorter duration. So I do think the ALJ lined up many allegations with specific citations to the record. You know, we were talking about didn't do that on activities. But I think when you look at the allegations as a whole that the ALJ considered and explained in the decision, and then you take a look at the activities that the ALJ was relying on, I think you can fairly see that those are in some degree of tension or conflict. And while the ALJ didn't, you know. We're supposed to figure out what she meant then. Well, I think you can see what the ALJ meant. I don't think. You didn't specifically say, but we can from what. The ALJ did say that her activities don't line up with her allegations. The ALJ didn't say this activity doesn't line up with this allegation. But I think when you're looking at it, you know, you look at the decision as a whole. I do. You know, the ALJ does say that these are in conflict. And I think when you look at them together, I think you can characterize that as a fair conflict that a reasonable person could, you know, rely on to support that conclusion that the ALJ drew in this case. Thank you. Thank you, Your Honors. Okay. Thank you. I'll give you more time since he went about 16 minutes over his time. We'll just finish until any of my colleagues don't have any more questions. Okay. Go ahead, please. I see a reoccurring theme in this case. I've been doing this a long time, social security practice, almost 40 years now. And this is one of the most obvious cases I've seen where one side of the evidence is presented, but not the other side. And when both sides are presented as required in social security law and was required by this circuit, then we can have a discussion about substantial evidence. Let me give you – could I just give you two examples? Memory problems. The ALJ at Excerpt of Record 49 and 50, she says, and quote, no memory problems are documented in the record. She fails to note that Dr. Lee, the neurologist that was treating her for her pseudo seizures and was treating her for her migraines and is a board-certified neurologist, stated at 374 and 1043 in his assessment, quote, patient does have memory problems, end quote. That was in her assessment. In 10 additional places in that record, he noted in the history that she had memory problems. But in those two particular ones, he noted in his assessment she had it. Other mental health providers did note memory problems. For example, at 1273 and 1281 are just two of many examples. The ALJ cherry-picked the evidence in this case, didn't mention any of those, but mentioned no memory problems. That is a fatal error. In Holohan, this court said, holding that an ALJ – made a holding that an ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others. As regards to her activities of daily living or self-directed activities, she didn't mention the problems she had in that area. She only mentioned the things that she did. Not that she needed substantial help. Not that she missed taking the kids to school. Not that she fell asleep while watching small children. Not that she had teenagers that helped take care of the children. She had one teenager. The four daughters were 8 to 12. And her siblings trusted her. Her sister trusted her to take care of her infant daughter. And another sibling trusted her to take care of her nephew. But that's neither here nor there. I do have some questions for you. So if I look at Dr. – not Dr. – Physician Assistant Holman. This is May 18, 2021. She says, diagnosis was pseudo seizures, and she was advised to continue mental health care. Patient says that she has not had a pseudo seizure in about a month. When I asked if anything has changed in her life, she says that some bothersome people have not been around her lately, so she may be she's doing better. So can you address – I understand your argument that how do they tie the pseudo seizures discussion to the RFC. Can you address your opposing counsel's argument that because it folds into mental health care, you then look at the mental health discussion, and then that – you know, the paragraphs that follow that discuss the mental health and how that impacts her RFC, that that should cover also the pseudo seizures? Yes. So the mental health discussion by the ALJ, we feel, was riddled with legal error. One, she said she had no memory problems. She said there was nothing in the records to support that. She said there's no communication problems. Holohan, her treating provider for 13 years, noted several of these pseudo seizures, some lasting 15 minutes or longer while in the office visit where she couldn't speak, couldn't communicate. Her analysis on the mental health issues was deficient. It didn't compare and contrast her problems. She just cherry-picked items that she was doing good at. Now, we could have a discussion about substantial evidence if she had done that, but she didn't. What is critical about why I think we should have a remand for payment of benefits is the January 2018 opinion from her primary care provider who the ALJ found persuasive, and she accepted it. And in there, the principal care provider opined that she could work 11 to 20 hours per week. That's not full-time work. That means she's disabled. So even with the ALJ's own findings, this is not a place, I believe, where we should give a mulligan and let the ALJ have it over again. We have 12 consistent opinions that she can't sustain full-time work. I'm sorry, I'm going to get emotional here. Because this lady, the ALJ said she's had no inpatient hospitalizations. But when she was 13, she was inpatient hospitalized in the psychiatric ward at Lourdes Hospital. Okay, wait, I'm sorry. If I look at what the ALJ cited was from the 2023 hearing, and I'm just going to read it. Any psychiatric admissions during the relevant period since 2017. ALJ, Mr. Tree, I didn't see any admits in the record. Did you come across any admits during the relevant period? Attorney, no. No, I didn't. Claimant, no. Attorney, Griselda, I think she's talking about like at Eastern or kind of like because your mental gets so bad, somebody takes you like to a mental health hospital. Have you had that happen? Claimant, no. Attorney, okay, yes. That that would be consistent, I think, with the records you're on. Or ALJ, okay. So I don't, you know, I understand reasonable minds can differ. But to say that ALJ was baseless in that decision, I saw that was in your brief, I think is not fair to the record. Because if I read this testimony that happened before me with the witness under oath, I would take her at her word. So, I mean, reasonable minds can differ. There's lots of evidence going both ways. So the question is, what's the standard of review here? Does it have to convince this panel? Or if a reasonable fact finder could come out this way, is that substantial evidence? So anyway, I thought that's a fair finding. If that is the testimony at the hearing, I think that's a fair finding that there wasn't a mental health admission. Your Honor, my point is this, that the ALJ never mentioned her history. Never mentioned that she tried to commit suicide at 13 and was hospitalized for two weeks. Never mentioned she cuts on herself. Never mentioned that she burns herself. Never mentioned she became pregnant at age 14 by a 34-year-old man who she ran away from home with to California and lived with for four years in an abusive relationship before she escaped. She got in a relationship with one other person. She had seven children. One of them died shortly after birth. There is a multitude of evidence that ALJ never mentioned, never talked about in the decision that support why she has pseudo seizures. Why she has migraines. Why she has borderline personality disorder. Why she has anxiety. She cannot sustain full-time work. Yes, she has variable times when she isolates herself with her family where she does better, where her migraines go significantly down. The ALJ did not mention that her mental health worker stated that your Topamax is causing, in her opinion, significant side effects including paranoia and other mental health impairments. And there is discussion in the record where she talked with her doctors about her weighing, do I want to not have migraines or do I want to have more mental health impairments? Because she had that problem with the Topamax. And that is a real problem for this lady. Thank you, Your Honor. Is there any other questions? Let me see if there are any other questions. Okay. Thank you very much. I want to thank both Mr. Tree and Mr. Staples for your very, very helpful arguments today. We really appreciate that. This matter is submitted and we're adjourned. Thank you. All rise.
judges: FLETCHER, KOH, Rayes